United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DENNIS B. ANDERSON,

Petitioner,

v.

TERESA A. SCHWARTZ,

Respondent.

NO. C06-2481 TEH

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Following denial of parole at his third parole hearing on March 10, 2004, Petitioner Dennis B. Anderson filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, before this Court on April 7, 2006. Respondent Teresa A. Schwartz filed an answer on June 8, 2006, and Petitioner filed a traverse on July 10, 2006. Petitioner subsequently filed a motion to expand the record on July 11, 2006, which Respondent does not oppose; thus, the Court GRANTS Petitioner's motion and has included the requested addendum, Petitioner's 1994 and 1997 psychological evaluations, as part of the record. This Court is also in receipt of Petitioner's July 25, 2006 request for oral argument; however, the Court DENIES Petitioner's request because a hearing is unnecessary to clarify any of the parties' written arguments. After carefully reviewing the parties' written arguments, the record, and governing law, the Court now DENIES Petitioner's request for a writ of habeas corpus for the reasons set forth below.

## I. BACKGROUND

On October 19, 1984, Petitioner Dennis B. Anderson turned himself in for the murder of his wife and her boyfriend. Petitioner does not dispute the following underlying facts: Petitioner became engaged to Karen Stoker on September 18, 1984, and they were married later that month. On October 10, 1984, they left for their honeymoon, during which Stoker

told Petitioner that she wanted an annulment because she was still in love with her former boyfriend, Donald Mason. Petitioner and Stoker returned home on October 17, 1984, and commenced discussing the annulment with an attorney. On October 19, Petitioner went to Stoker's home to pick up his belongings. When he arrived, Stoker, Mason, and Stoker's father and two young children were at the house. Petitioner retrieved his shotgun from the laundry room and loaded it, putting spare shells in his pocket. He went to the kitchen and shot Mason at close range in the hand and chest. Petitioner then chased Stoker outside and beat her head with the butt of the gun, rendering her unconscious. He proceeded to reload the gun with the spare shells and, while Stoker was still unconscious, shot her in the back.

At trial, Petitioner testified in his own defense that he committed these offenses in a dissociative state, during which he experienced disconnected thoughts and strobe-light effects. Family and friends testified to a head injury that Petitioner had suffered as a child, as well as the depressive and suicidal episodes Petitioner periodically went through as the result of multiple failed relationships.

On November 8, 1985, a jury convicted Petitioner of two counts of murder in the second degree. Petitioner received two concurrent sentences of seventeen years to life and remains a prisoner of the State of California. He is currently confined at the California Medical Facility in Vacaville.

In the instant petition, Petitioner contests the outcome of his third parole hearing. His first parole hearing was held before the California Board of Prison Terms ("Board") in 1995 and resulted in the denial of parole consideration for two years. At his second hearing in 1997, the Board denied Petitioner parole consideration for five years. At his most recent hearing in 2004, the Board denied Petitioner parole consideration for four years.

On February 3, 2005, Petitioner filed a petition for a writ of habeas corpus in San Mateo County Superior Court. The court denied his petition in a written decision filed on March 28, 2005. Resp. Ex. 6. Subsequently, the California Court of Appeal and California Supreme Court summarily denied Petitioner's habeas petition in May 2005 and February 2006, respectively. Resp. Ex. 8, 10.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

"Clearly established federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412 (2000). Section 2254(d)(1) "restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Id.* at 412. The Supreme Court has repeatedly explained that AEDPA – which embodies deep-seated principles of comity, finality, and federalism – establishes a highly deferential standard for reviewing state-court determinations. *See id.* at 436. Thus, the Court has emphasized that "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

While Petitioner questions the applicability of AEDPA to his request for habeas relief, the Ninth Circuit has applied § 2254(d) to review of parole suitability decisions. *See Rosas v. Nielsen*, 428 F.3d 1229, 1232-33 (9th Cir. 2005) (per curiam); *see also McQuillion v. Duncan*, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA's deferential standard of review under § 2254 applies to such decisions). Thus, this Court shall analyze and rule on Petitioner's claims under the standards established by AEDPA.

United States District Court
For the Northern District of California

## III. DISCUSSION

### A. Exhaustion

With one exception, Respondent does not contest that Petitioner's claims have been exhausted: "Petitioner appears to have exhausted his cognizable claims in the instant petition. [However,] Respondent does not admit Petitioner has exhausted his claims to the extent they are more broadly interpreted to encompass any systematic issues beyond this particular parole consideration hearing." Answer ¶ 14. Petitioner, on the other hand, contends "that he has exhausted his claim that the [Board's] refusal to deny him parole is part of a systemic [sic] pattern and practice of routinely denying parole to lifers in violation of the statutory mandate." Traverse ¶ 5.

The Court need not resolve the dispute over whether this claim has been exhausted because it finds that the claim has no merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). The Court concludes, for the reasons discussed below, that the Board afforded Petitioner an individualized assessment prior to denying him parole. Consequently, even if the pattern and practice alleged by Petitioner exists, it did not form the basis for denial of Petitioner's parole.

### B. Whether Petitioner Has a Liberty Interest in Parole

On Petitioner's undisputedly exhausted claims, Respondent argues as a threshold matter that, while the Fourteenth Amendment of the United States Constitution protects against state deprivation of any person's life, liberty, or property without due process of law, Petitioner has no federally protected liberty interest in parole. Based on this argument, Respondent contends that this Court therefore lacks jurisdiction over Petitioner's claims.

Upon careful review of relevant legal authorities, the Court finds Respondent's argument to be incorrect. While a convicted person has no inherent or constitutional right to early release on parole, a state's statutory parole scheme may create "a presumption that parole release will be granted" if it uses mandatory rather than permissive language.

*Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979). For instance, in *Greenholtz,* the Supreme Court held that Nebraska's parole statute, which included mandatory language that the parole board "shall" release the prisoner on parole absent certain conditions, created a constitutionally protected right that parole would be granted if the listed conditions were not found to exist. *Id.* at 11-12. Similarly, in *Board of Pardons v. Allen*, 482 U.S. 369, 376-78 (1987), the Supreme Court held that Montana's statutory parole scheme, which also instructed that the parole board "shall" release a prisoner on parole absent certain conditions, created a liberty interest in release on parole if those conditions were found not to exist. Such a presumption of parole release gives rise to a constitutionally protected liberty interest that cannot be denied without adequate due process of law. *Greenholtz*, 442 U.S. at 11-16; *see also Allen*, 482 U.S. at 376-78.

California's parole scheme largely parallels the Montana and Nebraska schemes at issue in *Greenholtz* and *Allen*. California Penal Code section 3041 instructs that the Board "shall" set a release date unless it decides this is inadvisable based on the nature and timing of the offense and in consideration of public safety:

> (a) . . . One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall . . . meet with the inmate and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime. . . .
>
> (b) The panel or the board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting. . . .

Cal. Penal Code § 3041. California's parole scheme therefore "gives rise to a cognizable liberty interest in release on parole" under *Allen* and *Greenholtz* because it "'creates a

presumption that parole release will be granted' unless the statutorily defined determinations [set forth in section 3041(b)] are made." *McQuillion*, 306 F.3d at 902 (quoting *Greenholtz*, 442 U.S. at 12); *see also Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003) (stating that section 3041 creates a liberty interest in parole that is protected by the due process clause, but holding that parole can be denied based on the gravity of the commitment offense).

Respondent relies on *In re Dannenberg*, 34 Cal. 4th 1061 (2005), to support her argument that there is no liberty interest in parole. However, Respondent overgeneralizes that case, which holds only that section 3041 stipulates that the Board must make a decision with regard to the public safety criterion prior to comparing a parole candidate's time served with other individuals who committed a similar offense. *Id.* at 1084. *Dannenberg* does not speak to whether section 3041 creates a liberty interest; rather, the case states only that the Board need not grant uniform parole dates unless it has determined that the inmate is not a threat to public safety based on his offense. Accordingly, this Court follows other judges in this district who have held that *Dannenberg* is immaterial to the question of whether a liberty interest exists in parole. In *McCauley v. Brown*, for example, Judge Susan Illston distinguished the issues addressed in *Dannenberg* from the question of a parole liberty interest, explaining that:

> *Dannenberg* does not answer the question of whether § 3041(b) creates a liberty interest in the parole suitability determination. Indeed, some language in *Dannenberg* seems to recognize such a liberty interest. In light of the absence of a clear determination by the California Supreme Court that § 3041(b) grants the [Board] limitless discretion to determine parole suitability, coupled with the Ninth Circuit holding in *McQuillion* that a protected liberty interest is created by § 3041(b), this court rejects respondent's argument that there is no protected liberty interest in parole for California inmates.

No. C 05-1817 SI (pr), 2006 U.S. Dist. LEXIS 2568, at *4 (N.D. Cal. Jan. 12, 2006) (citation omitted); *see also McElwee v. Kane*, No. C 05-03768 CRB, 2006 U.S. Dist. LEXIS 15751, at *11-12 (N.D. Cal. Mar. 21, 2006) (holding that the court in *Dannenberg* actually found section 3041(b) to impose a mandatory duty on the Board, thus establishing a liberty interest in parole); *Blankenship v. Kane*, No. C 04-5450 CW (PR), 2006 U.S. Dist. LEXIS 18559, at

*8 (N.D. Cal. Feb. 28, 2006) (noting that "the majority of district courts . . . have determined that *Dannenberg* did not address the mandatory nature of the parole statute, and thus did not affect *McQuillion*'s holding that California's statute creates a federally protected liberty interest in parole release").

Respondent also observes that *Sandin v. Conner* held that state-created liberty interests are limited to freedoms from restraint that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995). Because Petitioner can expect to be imprisoned for life, Respondent claims, denial of parole is not an "atypical" or "significant hardship," so section 3041 does not give rise to a state-created liberty interest. However, *Sandin* did not foreclose the possibility that a state parole scheme may create a protectable liberty interest. Indeed, the case did not discuss parole at all, and, when the Ninth Circuit held that section 3041 creates a liberty interest in parole, it explicitly interpreted *Sandin* as applying "to internal prison disciplinary regulations" only. *McQuillion*, 306 F.3d at 902-03.

For all of the above reasons, this Court rejects Respondent's argument that California inmates lack a protected liberty interest in parole. The Court therefore has jurisdiction over this petition and now turns to the merits of Petitioner's claims.

**C. Petitioner's Due Process Claim**

Petitioner first claims that he is entitled to habeas relief because he was denied due process of law under the Fourteenth Amendment. Respondent argues that any due process rights Petitioner might have had were satisfied by the Board's (1) having afforded Petitioner the opportunity to be heard in connection with the decision whether to release him on parole and (2) informing Petitioner, after denying his parole, in what respects he fell short in qualifying for parole. Respondent argues that *Greenholtz* constitutes the clearly established Supreme Court law on this issue and supercedes the Ninth Circuit decision in *Biggs*, 334 F.3d at 915, which holds that "some evidence" must support the Board's decision to deny parole.

United States District Court
For the Northern District of California

This argument, however, wrongly attempts to distinguish another well-established Supreme Court holding. In *Superintendent v. Hill*, 472 U.S. 445, 454 (1985), the Supreme Court held that the Board must base its decision to revoke an inmate's good time credits on "some evidence." In so holding, the Supreme Court opined that an inmate has a liberty interest in good time credits because those credits advance the date of his or her release from prison. Thus, it is easily inferred, and has been so inferred by the Ninth Circuit, that the same liberty interest exists in the setting of a parole date: "Though the liberty interest at stake [in *Hill*] surrounded the accumulation of good time credits, rather than the parole decision which is at issue here, both directly affect the duration of the prison term; thus, the *Hill* decision is applicable in [cases involving parole decisions]." *Jancsek v. Oregon Board of Parole*, 833 F.2d 1389, 1390 (1987). While the "some evidence" standard for parole dates as established in *Biggs*, *McQuillion*, and *Jancsek* is Ninth Circuit law and thus only persuasive authority, this Court is nonetheless persuaded that the Ninth Circuit in those recent holdings accurately interpreted and applied the well-established Supreme Court law created by *Hill*.

Applying the "some evidence" standard to this case, the Court is sympathetic to Petitioner's contention that the Board made several findings that may not have been supported by the evidence. Nevertheless, as discussed below, the Court finds the requisite "some evidence" in the record to support the Board's denial of parole.

Under California law, the Board considers several factors when determining an inmate's suitability for parole, including whether the inmate: (1) "committed the offense in an especially heinous, atrocious, or cruel manner"; (2) possesses a previous record of violence; (3) has an "unstable or tumultuous" social history; (4) has ever sexually assaulted another individual in a "sadistic" manner; (5) "has a lengthy history of severe mental problems related to the offense"; or (6) has engaged in "serious misconduct" while in prison. Cal. Code Regs. tit. 15, § 2402(c). In considering whether the offense was committed in an "especially heinous, atrocious, or cruel manner," the Board examines whether:

> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

United States District Court
For the Northern District of California

> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

*Id.* § 2402(c)(1).

In this case, the Court finds the requisite "some evidence" to support the Board's finding that Petitioner's offense "was committed in an especially heinous, atrocious, or cruel manner." Although Petitioner correctly points out that it may be error to characterize Petitioner's motive as trivial or his manner as dispassionate because his motive involved one victim having requested of him an annulment during their honeymoon and then returning to her previous boyfriend, the second victim, the questionable nature of this single factor does not negate the reasonableness of relying on the combined weight of the other factors to deny Petitioner's parole. Multiple victims were killed or otherwise harmed by the offense. Additionally, not only did Petitioner shoot and kill two people, but he killed one of them in front of her father and two young children, thus causing those individuals to "suffer[] emotional distress from watching their mother [or daughter] . . . being murdered." Mar. 10, 2004 Parole Hr'g Tr. at 77 (Resp. Ex. 2). He did so in an execution-style manner, chasing both victims while armed, shooting one, then beating the other unconscious and shooting her in the back. Such abuse also demonstrates the heinous nature of the offense and a callous disregard for human life. Petitioner argues that all murders demonstrate such a disregard and thus this factor should not be instrumental in finding against parole. However, the California Supreme Court has clarified that:

> [a]lthough the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant.

United States District Court
For the Northern District of California

*In re Rosenkrantz*, 29 Cal. 4th 616, 682-83 (2002). This double-murder was, once again, committed in front of one victim's family and involved beating one of the victims; both of these factors heighten the callousness of the crime.[1]

Petitioner challenges whether the nature of an inmate's offense is sufficient to deny parole, but the Ninth Circuit has explicitly held that the callousness of an inmate's offense can itself constitute the "some evidence" required to uphold the Board's decision to deny parole. *Biggs*, 334 F.3d at 915. The California Supreme Court has similarly held that "the nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." *Rosenkrantz*, 29 Cal. 4th at 682.

Petitioner attempts to distinguish his case from *Biggs*, which involved the Board's denial of parole at an inmate's first parole hearing, by pointing to the Ninth Circuit's statement that, "should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation [over time], denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." *Id.* at 916. However, this statement is dicta, which makes it insufficient as a basis for overruling the Board's decision on habeas review. Because "clearly established Federal law, as determined by [the Supreme Court]," includes only the holdings of the Supreme Court but expressly excludes that Court's dicta, *Williams*, 529 U.S. at 412, and because a district court cannot reverse a state court decision "merely because that decision conflicts with Ninth Circuit precedent on a federal constitutional issue," *Duhaime v. DuCharme*, 200 F.3d 597, 598 (9th Cir. 2000), it follows that Ninth Circuit dicta cannot form the basis for rejecting a state court decision under AEDPA. As a result, this Court follows its sister courts in this district in holding that the language Petitioner attempts to rely on from *Biggs* is insufficient to support overturning the state court's decision to deny habeas relief. *E.g.*, *Siller v. Brown*, No. C 04-4034, 2005 U.S. Dist. LEXIS 9370, at *29-30 (N.D. Cal. May 6,

---

[1]A similar case decided in this district noted that a "child's presence [at his mother's shooting] reasonably could be viewed as showing an extremely callous disregard for suffering as it allowed a child to see his mother killed." *Siller v. Brown*, No. C 04-4034 SI (pr), 2005 U.S. Dist. LEXIS 9370, at *26 (N.D. Cal. May 6, 2005).

2005) (stating that the *Biggs*'s "dicta is not clearly established federal law as set forth by the Supreme Court, such that the state court's refusal to adopt it would be a decision contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court"); *Machado v. Kane*, No. C 05-01632 WHA, 2006 U.S. Dist. LEXIS 9008, at *17-18 (N.D. Cal. Feb. 22, 2006) (refusing to "rely upon such a thin reed [as the dicta in *Biggs*] to overturn, in a habeas action, a state court ruling" and noting that the dicta was "without apparent foundation in any Supreme Court holding").[2]

Petitioner correctly points out that several courts have granted a writ of habeas corpus when the petitioner has been found unsuitable for parole multiple times based solely on his commitment offense. *See, e.g., Martin v. Marshall*, 431 F. Supp. 2d 1038 (N.D. Cal. 2006) (finding due process violation in governor's overturning of Board's grant of parole date at petitioner's fifth parole suitability hearing, based in part on the Superior Court's finding that no evidence supported the characterization of the crime as a "callous disregard for human life"); *Johnson v. Finn*, No. CIV S-05-0385 DFL GGH P, 2006 U.S. Dist. LEXIS 2001 (E.D. Cal. Jan. 19, 2006) (finding due process violation in denial of parole at twelfth parole suitability hearing after petitioner had served twenty-four years of sentence of life with the possibility of parole and met circumstances tending to indicate suitability for parole); *Irons v. Warden of Cal. State Prison-Solano*, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005)[3] (finding due process violation in denial of parole at fifth parole suitability hearing after petitioner had served sixteen years of fifteen years to life sentence for second degree murder and met circumstances tending to indicate suitability for parole); *Masoner v. California*, No. CV 03-1261-ER, 2004 U.S. Dist. LEXIS 9221 (C.D. Cal. Jan. 23, 2004) (finding due process violation based on the Board's "continued reliance" on pre-conviction factors to justify denial of parole suitability after petitioner had served twenty-one years of

---

[2]Contrary to Petitioner's assertion, the opinion in *Machado* contains no designation, pursuant to Civil Local Rule 7-14, suggesting the court's intention that it remain unpublished. Thus, citation to *Machado* does not violate Civil Local Rule 3-4(e).

[3]This case is currently pending before the Ninth Circuit on appeal. *See Irons v. Carey*, 408 F.3d 1165 (9th Cir. 2005).

fifteen years to life sentence for second degree murder, had participated in therapy and self-help programming, and had impeccable prison record). However, this Court is reluctant to follow the above cases because their findings were based on nothing more than Ninth Circuit dicta, which, as explained above, is insufficient to grant habeas relief under AEDPA. None of the cases cited by Petitioner recognized the relevant language from *Biggs* as dicta, and they therefore did not confront the well-established AEDPA standard that dictates that neither reliance on Ninth Circuit law nor reliance on Ninth Circuit or even Supreme Court dicta is sufficient to overturn a state court's denial of a habeas petition.

In addition, the above cases are factually distinguishable from this case in a number of significant ways. For instance, while Petitioner contests the Board's decision at his third parole hearing, most petitioners in the cases relied on by Petitioner were contesting decisions taking place at their fifth or even twelfth subsequent hearing. Also, many of the above courts compared the gravity and egregiousness of the petitioner's offense to that of the petitioner in *Biggs*; if it was less grave than Biggs's offense, a court would sometimes suggest that the lesser degree of gravity supported its finding that the Board's denial of a parole date violated the petitioner's due process rights. However, whereas Biggs's crime consisted of participating in a ruse leading to a murder, Petitioner's crime, as discussed above, consisted of shooting two individuals, including beating one unconscious and proceeding to shoot her in front of her children. Thus, it cannot be said that Petitioner's crime was less grave than Biggs's. Finally, in several of the cases where the writ was granted, the Board actually did set a parole date which was later reversed by the governor, unlike this case, where the Board found Petitioner to be unsuitable for parole. The courts that granted the writ in those cases opined that since the Board had found the petitioner suitable for parole, that body's decision was further suggestive of the court's finding that the governor lacked evidence in his decision to reverse a petitioner's established parole date. Based on all of the above distinguishing facts, as well as the courts' failure to consider that the language in *Biggs* was dicta and therefore insufficient authority to grant habeas relief under AEDPA, this Court does not find the cases relied on by Petitioner to be persuasive.

Moreover, while Petitioner's commitment offense would be sufficient standing alone to constitute "some evidence" on which the Board could legally base its decision, the Board also set forth additional evidence that further supports its finding of unsuitability. With regard to Petitioner's proposed parole plan, the Board observed that there was no evidence in the record regarding "availability and further treatment" for Petitioner's mental health needs and voiced its concern regarding the availability of support and medical assistance for Petitioner should something "click[] out of order" in relation to his mental health condition. Mar. 10, 2004 Parole Hr'g Tr. at 79. Petitioner's bipolar disorder, while apparently controlled by medication, is nevertheless a severe mental problem that related to his offense; thus, the Board had legitimate cause for concern regarding Petitioner's ability to maintain his state of remission, aided by therapy and medication. The Board stated in its decision:

> [Petitioner's] intent is to go to a location, which I believe has been described as Truckee, California, a somewhat desolate area, especially when it snows. And I don't know what they have as far as availability and further treatment. A statement that the inmate himself made during this hearing, he said, quote, when something clicks out of order. Very frankly, this Panel is concerned about something clicking out of order when there is not the availability of anybody to help unclick whatever clicked out.

*Id*. Petitioner contends that no evidence existed to support these concerns, but Petitioner fails to controvert the Board's conclusions about the suitability of Truckee as part of Petitioner's parole plan. In his traverse, Petitioner notes only that the Board pointed to no evidence of Truckee's not having snow-plow access in case Petitioner should need to travel for help with medication or other mental-health related concerns. However, nowhere does Petitioner allege that such services or accessibility actually do exist in Truckee. Similarly, although Petitioner's parole plan stated that his sister lives in Auburn, which Petitioner contended was "not that far away" from Truckee, Mar. 10, 2004 Parole Hr'g Tr. at 19, his plan failed to mention anyone Petitioner would live with or who would be with Petitioner consistently enough to monitor his medication. Petitioner likewise mentioned that he planned to create a support group, but he failed to identify any existing group that he could join or discuss the feasibility of creating a new support group in Truckee. The Board also considered the letters

and statements opposing Petitioner's parole from the district attorney, San Mateo Police Department, and Karen Stoker's children. Mar. 10, 2004 Parole Hr'g Tr. at 41-42, 48-52, 67-76. Thus, while Petitioner's commitment offense was perhaps the most heavily weighed factor in the Board's decision, Petitioner's parole plan and the opposition to his release also constituted "some evidence" on which the Board could justifiably base its decision.

Petitioner further argues that the Board violated his due process rights by failing to consider positive evidence suggesting his suitability for parole, but this argument is not persuasive. By regulation, the suitability factors include: lack of a juvenile record or criminal history; stable social history; signs of remorse; significant stress as a motivating factor for the crime; age; realistic plans for the future; and good institutional behavior. Cal. Code Regs. tit. 15, § 2402(d). The parole hearing transcript reveals that the Board heard evidence and argument on many of these factors. *E.g.*, Mar. 10 2004 Parole Hr'g Tr. at 15, 35, 39 (lack of criminal history and feelings of remorse); *id.* at 16-18, 49-50 (age and social history); *id.* at 18-21 (plans for the future, including potential plans for post-release employment); *id.* at 21-35, 43-48 (institutional behavior). The Board also considered letters of support submitted by Petitioner's family and others that touched on several of the suitability factors. *Id.* at 39-41. Ultimately, the Board praised Petitioner for his "positive programming" but concluded that such positive factors did "not outweigh the factors of unsuitability." *Id.* at 80. While Petitioner may be unhappy with the manner in which the Board weighed the relevant factors, this Court cannot find that the Board refused to consider factors tending to indicate Petitioner's suitability for parole.

Nonetheless, upon its review of the record, this Court is somewhat troubled by the Board's finding that Petitioner does not feel remorse for the victims. During his hearing, Petitioner attested to the fact that he feels "absolutely terrible." *Id.* at 15. He stated, "I have taken my life since that point and I've directed it . . . in two ways. One is to change myself so that this could never happen again. And the other is to, in some small way, pay back society for the losses which occurred. I can't make up for two lives. I can't make up for the hurt that I've caused so many people. That I can't change. I can only change the future." *Id.*

United States District Court
For the Northern District of California

While the Board alleged that Petitioner's latest psychological report suggests that Petitioner, while showing remorse, does not appear to show remorse for the actual victims, *id.* at 79, there is no evidence of this in the report. The report stated that Petitioner "expressed his feelings of misgiving and remorse for the offenses," July 23, 2002 Psych. Eval. at 7 (Resp. Ex. 5), and the Board appears to have read the report's failure to say explicitly that Petitioner shows remorse for the victims as a finding that he does not show such remorse. This conclusion appears to be unsupported by the evidence.

In addition, the Court questions the Board's finding that Petitioner lacked suitable employment plans. The Board based this finding primarily on its concern that Petitioner might be unlikely to regain his license to practice law, but Petitioner did not intend to practice law; instead, he believed that he would obtain employment either "because of his knowledge of tax law, accounting, and finances" or as a "brailler." Mar. 10, 2004 Parole Hr'g Tr. at 20; Oct. 2002 Life Prisoner Eval. at 2 (Resp. Ex. 4). However, while the Court finds that the Board lacked evidence to substantiate these particular findings, the Board's other conclusions about the uncertainties of Petitioner's parole plan are well-founded.

Finally, Petitioner contends that the Board's denial of a parole date violated his due process rights because California Penal Code section 3041(a) mandates that parole "shall normally" be granted. However, as Respondent correctly argues, Petitioner misconstrues this mandate. As the California Supreme Court established in *Dannenberg*, even though there is a liberty interest in parole, the Board is vested with the discretion to determine, based on the relevant factors outlined above, whether Petitioner presents a threat to public safety. *Dannenberg*, 34 Cal. 4th at 1087. If there is some evidence to support the Board's decision that Petitioner presents a risk to public safety, the Board is then under no requirement to set a parole date after making such a determination. *Id.*; *see also Rosenkrantz*, 29 Cal. 4th at 654 (stating that section 3041 "provides that the [Board] must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction"). Petitioner himself recognizes this contingency. *See* Traverse at 9-11. In this case, the Board determined that, primarily based

on Petitioner's commitment offense and questionable parole plans, Petitioner still presented a risk to public safety. Consequently, the Board was under no requirement to establish his parole date, and Petitioner's claim based on the language of section 3041(a) has no merit.

In short, because the Court finds "some evidence" to support the Board's conclusions regarding Petitioner's offense, the state court's decision upholding the Board's denial of parole must be allowed to stand. The Board's alleged failure to consider positive factors evidencing Petitioner's suitability for parole is not "properly . . . considered as part of Petitioner's due process challenge. The only relevant inquiry is whether there was 'some evidence' to support the Board's decision to deny parole." *Rodriguez v. Campbell*, No. CIV S-01-0476 DFL JFM P, 2005 U.S. Dist. LEXIS 39835, at *14 (E.D. Cal. June 2, 2005). Further, no combination of positive evidence mandates a Board to set a release date. *Greenholtz*, 442 U.S. at 10. In this case, the Board's decision that Petitioner's suitability factors did not outweigh his unsuitability factors, and the state court's refusal to reverse that decision, was not contrary to, or an unreasonable application of, clearly established Supreme Court law for the reasons discussed above. Accordingly, the Court DENIES Petitioner's due process claim.

**D. Petitioner's Americans with Disabilities Act Claim**

Petitioner also contends that the Board's refusal to set his parole date based in part on his mental illness and related concerns about his parole plan violated his rights under the Americans with Disabilities Act ("ADA"). Petitioner rests this claim on *Thompson v. Davis*, 295 F.3d 890 (9th Cir. 2002), in which the Ninth Circuit held that the ADA was applicable to substantive decisions made by the Board during parole hearings. Although Petitioner does not cite any authority from the Supreme Court to support his ADA claim, this Court need not decide whether *Thompson* reflects clearly established federal law under AEDPA for two reasons: first, because Respondent does not challenge this issue and, second, because even if *Thompson* qualifies as clearly established law, Petitioner's claim nonetheless fails for the reasons discussed below.

United States District Court
For the Northern District of California

Respondent first argues that Petitioner's ADA claim lacks merit because he stated before the Board that he did not have a disability as defined by the ADA, but Petitioner convincingly points out that this statement was made in relation to whether Petitioner required disability accommodations to participate fully in his parole hearing. This Court is not convinced that Petitioner's denial of having a disability in that context precludes him from now coming forward with an ADA claim. However, the Court need not definitively decide the waiver issue because, as explained below, Petitioner's ADA claim lacks merit even if Petitioner does have a disability as defined by the ADA.

In *Thompson*, two inmates contested their denial of parole, alleging that the Board's refusal to set their parole date was based solely on their disability of drug addiction. *Id.* at 894. The Ninth Circuit held that such a categorical denial of parole based on disability would violate the ADA. *Id.* at 898. However, the court was quite clear in limiting its holding narrowly to the issue of categorical denials: "We hold only that plaintiffs may state a claim under Title II [of the ADA] based on their allegations that the parole board failed to perform an individualized assessment of the threat they pose to the community by categorically excluding from consideration for parole all people with substance abuse histories." *Id*. at 898 n.4. *Thompson* therefore does not preclude the consideration of evidence on an inmate's disability but, in fact, recognizes its validity; the court explained that "[a] person's disability that leads one to a propensity to commit crime may certainly be relevant in assessing whether that individual is qualified for parole." *Id.*

In this case, Petitioner argues that the Board improperly considered his mental disability because psychological reports suggested that Petitioner's mental condition, with the assistance of medication and counseling, would no longer present a danger of the same type that was present when Petitioner committed the offense. However, *Thompson* does not bar consideration of an inmate's disability; it bars only categorical denial of parole to persons with disabilities. Here, Petitioner's mental illness, especially when combined with questionable parole plans that failed to establish concretely Petitioner's ability to obtain and participate in counseling, support groups, and assistance with medication, was a legitimate

United States District Court
For the Northern District of California

factor for the Board to take under consideration. Unlike the inmates in *Thompson*, Petitioner was not categorically denied parole based on his mental illness, but rather was afforded the individualized assessment of parole suitability mandated by the Ninth Circuit in *Thompson*. Consequently, Petitioner has failed to demonstrate that adequate grounds exist for this Court to reverse the state court's rejection of Petitioner's ADA claim.

## IV. CONCLUSION

In sum, although Petitioner has a liberty interest in parole, this Court cannot overturn the state court's refusal to reverse the Board's denial of parole based on due process grounds because the Court finds that the Board had "some evidence," primarily focusing on Petitioner's commitment offense and questionable parole plans, to support its decision. *Biggs*, 334 F.3d at 915. In addition, the Court finds that the state court's determination that the Board's decision did not violate Petitioner's rights under the ADA was not contrary to law or an unreasonable application of law because the Board properly considered evidence of Petitioner's mental health without categorically denying parole based on Petitioner's alleged disability. Accordingly, with good cause appearing, the Court hereby DENIES Petitioner's request for a writ of habeas corpus in its entirety. The Clerk shall enter judgment for Respondent and close the file.

**IT IS SO ORDERED.**

Dated: 08/24/06

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT